May it please the Court, in the three years leading up to the signing of the Asset Purchase Agreement, some important things happened that are dispositive or informative of how this case should turn out. First of all, Mr. Sanks finally accepted one of Block's repeated offers to become a franchise of H&R Block. Secondly, he bought another office from H&R Block to fold that into his franchise, the 5710 Ogeechee Road. And finally, he grew a modest tax business from 3,000 clients to a little over 5,000 clients in that three-year time frame, generating about $2.7 million in revenue that Block shared in. In 2014, Block required Sanks, Mr. Sanks, to sell back his franchise. Mr. Sanks wanted to sell that franchise to a third party, but due to a right of first refusal, he had to sell it back to Block. Only after Block failed to retain four critical tax preparers that worked for Mr. Sanks, did Block sue, attempting to cover up its own failings, and saying and alleging that Mr. Sanks didn't own this franchise, or Mr. Sanks was supposed to supposedly have sold something other than the franchise back to H&R Block. So the question that much of this case turns on is, did Bobby Sanks and Mr. Sanks agree to sell his franchise business or something else, and did he actually deliver what was promised? As we'll discuss today, he certainly sold what was promised. That was his franchise. So from our briefs, you can see there are a number of other issues that we took issue with. Essentially, the district court rubber-stamped virtually everything that Block asked for in the underlying action. And there are a myriad of errors that we allege, but I want to talk about the three points. I want to talk about the ownership issue. I want to talk about the two documents that resulted in the release of most of the claims that were involved in this. And finally, I want to talk about the debilitating sanctions that were entered, not only against my client, but against myself, counsel, and our firm, that were not justified. Alright, the impact on Mr. Sanks, you know, was significant in this case, and we are asking that the court ultimately reverse the orders of the district court and enter judgment in favor of him. Alright, so let's look at, let's dive into this. Let's look at what did Block buy? You know, this is as basic as going back to the first year of law school. You got a contract, what do you do? If you got a contract that supposedly was not complied with, you look to the terms of the contract. Okay? The asset purchase agreement. What did the asset purchase agreement say that Block was going to purchase? Well, it says right in the recitals, right up front, it says that Bobby Sanks agreed to sell his business which the seller operated under purchaser's trade name and service marks pursuant to a franchise license agreement that was executed by the seller and the purchaser in December 2011. That's the franchise license agreement. Secondly, it goes on to say that Mr. Sanks was selling back to Block all of his rights under the franchise license agreement. It doesn't mention anything about Sanks income tax, and that's what Block is contending. You will not find the term Sanks income tax anywhere in this document. You interpret this through the four corners. The language is clear. The district court actually acknowledged in its May 1st, 2017 order that Mr. Sanks was selling back to Block the franchise business that he established back in 2011. It is a glaring error by the district court to find that Mr. Sanks sold something other than a franchise that was established in 2011. What was that franchise? That franchise was the tax business. That was the tax business that was comprised of those four critical tax preparers, Jennifer Brown, Tracy Valentine, Beth Ferguson, Sue Kiley. It comprised of the 5710 Ogeechee Road office that absolutely had nothing to do with Sanks income tax. And Mr. Sanks transferred all of those assets over to Block. The key aspect of this transaction is the business. It's the clients. When you said he transferred all of the assets, the district court found otherwise, correct? Yeah, erroneously found otherwise. That is correct, Judge. But I thought that there was evidence in the record that the client information, the tax Am I wrong? I don't believe you are correct. And that is an excellent point though, Your Honor. I think the key aspect of this that the court glossed over or ignored is that if you look at that franchise license agreement, and part of that franchise license agreement in 2011 included a conversion agreement. And that conversion agreement required several things. It required that Bobby Sanks transfer his right title and interest in all tax preparation client lists and files to Block. And as Mr. Sanks grew his business, he had about 3,000 in 2011, 3,000 clients. He had about 5,000 in 2014. Every time he added a client, you know where that information went to? It went to Block. Block had at its fingertips, in its computer system, all of the client information that Mr. Sanks' franchise had. So it is an absolute error for the district court to find that that client information wasn't transferred to Block. Block had that from day one. Otherwise, it would have been a violation of the franchise license agreement. Which entity did the family members claim ownership in? Sanks Income Tax. And you're saying that was not part of the purchase agreement? That's exactly what I'm saying, Your Honor. And again, the proof of that is you look to the contract that's contained here. There isn't anything in this contract that talks about Sanks Income Tax. Isn't there also, though, a non-compete agreement? Yes, there is. And wouldn't Sanks Income Tax be competing with the entities purchased by Block? Sanks Income Tax is not a party to this contract. So it wouldn't have any involvement with respect to the non-compete. The non-compete related to Bobby Sanks. Counsel, isn't that the property on Ogeechee Road? Isn't what the property at Ogeechee Road? Sanks Income Tax. The office was part of Sanks Income Tax. And that's why the office wasn't part of this deal. You know, what's interesting is if you go back into 2011 and you look at the due diligence, which was extensive that Block undertook. You know, the record demonstrates how extensive it was. But they understood that Mr. Sanks, Bobby Sanks, excluded that property. And if you look at the document itself, again, look to the contract. The contract under Section 1.2 excludes any real estate, excludes the property at 5669 Ogeechee Road. Why then was there communication, counsel, regarding the unavailability of that property upon the alleged expiration of a lease? Mr. Sanks didn't have the ability to sell that building. If you go back in time, this business was originally established in the 80s by Bobby's mom. Okay, this is a family business. Okay, when it came time for Block's inquiry about becoming a franchise, Mr. Sanks told them, hey, look, I can't transfer this office. And that office wasn't his to transfer. So it was known from day one that that office couldn't be part of this. And what's interesting is Block understood that. Block understood it wasn't getting this building. And Block understood and still went forward with this agreement. They still wanted to make it a franchise. They still wanted to make this a, buy back that franchise as part of the asset purchase agreement. So, you know, so it is, it's a red herring, whatever you want to call it, to suggest that the 56, I mean, that anything associated with that office had any aspect or any causation or any, caused any damages associated with Block in this case. The causation with respect to their loss stems solely from their failure to retain four tax preparers. Wasn't there evidence too, though, that it wasn't necessarily connected directly to the preparers themselves, but the location, that clients were loyal to a particular location, not necessarily a particular person working at the business? That's not, that's not accurate. The record shows that they are, they are. So you're saying, are you saying there's nothing in the record that suggests that at all? Or are you just saying it's not as strong, you can't make as strong of an inference from that as you can from the presence or absence of the individuals? I think the latter. I think there is some, there is some evidence that the location is important. And that's true. But they knew they weren't getting the location to begin with and they wanted to go forward with it. But to your point, think about this. You know, Bobby's clients went over to Block after the transfer. Okay. They didn't stay at, you know, at the 5669 office. You know the people that stayed at the 5669 office? Those were the folks that were, that were Jennifer Brown's, the Tracy Valentine's, the Beth Ferguson's. Those, those tax preparers' clients stayed at that location. Sean Moore, representative of Block, testified that the, that the tax, that people follow their tax preparer. Okay, so the clients will follow that tax preparer. And again, so when you, when you consider Sean Moore's testimony, when you consider the fact that a number of clients left that 5669 and went with Block and are still with Block today, and you also couple that again with the Sean Moore testimony, you understand now that the critical aspect of this is the people, not the location. And this document, again, confirms that. The document didn't make a condition of closing staying in that office. The document, the asset purchase agreement, made as a condition of closing retaining those four key tax preparers. So I think from, when you, when you look at that, I think that answers your question that the most important criteria are the tax preparers and where they went. And if you look at the actual, the number of tax returns prepared at the 5669 office after Bobby left, it went down significantly because a lot of them went over to Block. You know, nearly 2,000 clients are with Block. You know, if this court is going to find that, that Block bought something other than the franchise back, you're going to have to rewrite the asset purchase agreement. You're going to have to include terms that aren't in here. You're going to have to include terms like the Sanks income tax. You're going to have to rewrite the franchise license agreement. You're going to have to ignore three years of history in which Block never once objected to any aspect of that franchise. They, they earned money from that franchise. They earned, you know, their share of, you know, over $2.7 million worth of income that came in. Time's running a little short. I want to jump ahead, if that's okay, to the settlements, unless you have other questions about this. Judge, you look like you got a question. No? Okay. I've got lots of questions. Okay. Ms. Henderson, are we into rebuttal time yet? I'm not. I'm at 12 minutes. He's at 7.55. Very good. All right. You know, the settlements, there's two, there's two, there's two documents that I think are informative of this, and that's in the asset purchase agreement at section 5.9. Basically, you know, that says that, that Block released any and all causes of action with respect to the seller's business and the franchise license agreement. That really gets to the ownership aspect of this. Okay. Block, or Bobby had to make a number of representations about the ownership of that business. Any information that was available at 2014 was also available back in 2011. So we think that that releases any claim that Block has about ownership. You know, with respect to the, to the amendment, again, we're looking at the document. I said, I started this argument off. Look at the documents. The documents in here support Mr. Sanks's argument. There was a forbearance in the First Amendment. Okay. Forbearance, if you look at the case law, what does that talk about? You know, you've got to tie forbearance to some timeframe. If it's an unlimited forbearance, and it's not tied or limited in any respect. But it doesn't become a release at that point, does it? It's the functional equivalent of a release, Your Honor. What case says that? The Glasgow case. And so when you're looking at it, but that, and it makes sense too. It says, hey, look, I'm not going to sue you. I'm not going to bring a claim to you. I'm going to forbear on bringing a claim. You know, so long, you know, and we gave up $100,000 of money that was owed to us, to Bobby Sanks. And saying that, hey, look, you know, we'll give up $100,000. If you look at Bobby's email that was sent in this, he said, look, I'm buying my piece. Doesn't Missouri law read into something like that a reasonable timeframe? You can read into it a reasonable timeframe. But there is nothing in this agreement that you could read into as far as a reasonable timeframe. The dates that are set forth in this document talk or relate to a completely different aspect. They are quoting provisions of the asset purchase agreement. Well, if it was intended to be a release, why wouldn't it just say release all claims? Again, this is a contract. This is a release that was drafted by Block. It was not a release. It was a forbearance agreement. It was a forbearance agreement. This was a document, though, that was drafted by Block. Block, if you look at the confidentiality agreement that came later, that confidentiality agreement had a forbearance term that was tied to a specific date. Block had the ability to identify, put in here and said, hey, look, this is not an unlimited forbearance. This is a forbearance only for a limited timeframe. And it doesn't make any sense, if you're looking at this in the grand scheme of things, it doesn't make any sense to say Bobby Sanks is giving up $100,000 to allow Block a few days or months to bring a claim. It doesn't make any sense. Independent of the forbearance and release issue, what was the bottom line purpose for the First Amendment? What was the goal of the parties? The bottom line amendment for the first agreement was to resolve these issues associated. Block's claims that Bobby, or this, it was designed to resolve these issues associated with Kathy Conaway starting up a new business, Sanks Income Tax. And the only reason Sanks, you know, she started that up was because the four people that Block was supposed to have retained to do this work didn't come over. And that was not Bobby's fault. That was Block's fault. Block knew before it signed the asset purchase agreement that one person wasn't coming and likely that another person wasn't coming. And they went ahead and did it anyway. And I'm going to reserve the rest of my time for it. Thank you. Thank you. Good morning, Mrs. Gilman. Good morning. May it please the court? I'm Stacey Gilman, counsel for H&R Block Eastern Enterprises, Inc. I'd like to take a moment to first address the facts of this case because there have been a lot of claims about what the facts were. But the evidence in this case showed that the facts were indeed straightforward and uncontroverted in relevant parts. This is a case about a tax business. Could you quickly address, because the one, I think the main point that your opposing counsel was making was that Sanks Income Tax is not part of the asset purchase agreement. Can you address that? I would be very happy to address that. And I have never understood that position given the facts of this case. The APA, from the very beginning, references 5669 Ogeechee Road as one of the two offices that was included in the sale. Mr. Sanks has said that that office was operating in its entirety as his franchise during the franchise period. He has acknowledged that the intention of the APA was to sell its assets, that business's assets, to H&R Block. And the notion that there was some separate business operating there is simply false. There was only ever one tax business at 5669 Ogeechee Road, and that was uncontroverted in the case. And, in fact, even the idea that Sanks Income Tax as a trade name was something separate is immediately dispelled by the record. Mr. Sanks admitted that that business, through the franchise period, still said Sanks Income Tax on the signage. The employees and the clients still referred to it as Sanks Income Tax. There's only ever been the one business, and it was, in fact, part of the sale. During the franchise period, unbeknownst to H&R Block, Mr. Sanks' sister had, as Mr. Kramer referenced, made a claim that he was not the owner, and she challenged him on it. The siblings hired lawyers, litigation was threatened, and ultimately Mr. Sanks admits that his lawyer sent her a letter with numerous lies, including among several others, that the H&R Block logos on the computer screens were just screensavers. He'd gotten the computers at rock-bottom prices from H&R Block, and those screensavers could be removed if they were bothering her, and that there were, as Mr. Kramer seemed to represent to the court today, two separate businesses, his franchise across the street and then Sanks Income Tax. That was just false. After lying to his sister, however, Mr. Sanks had a problem, and the solution he came up with to that problem was evident from the record. He turned around and purported to sell the entire business to H&R Block, and the claim that he was required to sell to H&R Block is not substantiated in the record. On the paperwork he submitted to Block, he did not identify any other offer that was on the table, and he never produced anything to us in discovery indicating that there was some other offer. Instead, he did, however, contract with H&R Block voluntarily to sell the business, and his own deposition testimony, as you had asked about, confirms that he intended 5669 Ogeechee Road to be included in the sale. He had to do something, though, with his sister, and so he told H&R Block that the lease on the building was expiring at the end of the year when, in fact, he admits there was no lease. He told H&R Block that they'd have to move the business when, in fact, the uncontroverted record showed that there was absolutely no reason that the business had to move. Even if that was not true or false, was it really material, and did it really affect what Block ended up doing? They went to another location. I just wonder if there was an analysis of the materiality of that particular statement. There can be no doubt that it was material from the record. H&R Block did move the location. They recognized an inherent risk even in making the move, but really what realized the injury to H&R Block was the fact that by moving Block away, it enabled his sister to continue seamlessly operating the business at its original location, astonishingly with his assistance. Well, even if it allowed his sister to continue on her business, I guess the question is whether, independent of that, whether it really affected Block, whether Block went to that location or another location, they didn't seem to be hesitant in moving to another spot. I understand that that was sort of maybe an extra benefit if, in fact, you say that this is a false statement about the availability of the building that allowed her to continue there, but I wonder whether there's enough evidence to say that it really affected what Block ultimately was going to do. Well, as you had, I think, indicated in your questioning earlier, the record indicated that that original location is what the clients returned to, and that is what the clients were loyal to, which defeats the argument about the employees as well. So it absolutely was material. Ninety to 95% of the clients who continued to patronize Ms. Conaway's continued operation of the business were the same clients who had gone to that location before, and that was true even after Jennifer Brown and Tracy Valentine, two of the employees you referred to, left the business the following tax season to start their own nearby location. They did not retain the clients. Ms. Conaway and Sanks Income Tax retained the clients. So it absolutely was material, and the judge correctly found and did not err by finding that. And I would note also for the record that the majority of the arguments that are made really are that the judge got the facts wrong, and those factual findings for summary judgment, unlike legal findings, which are reviewed de novo, are reviewed for clear error in the Eighth Circuit. There was absolutely no clear error in this case on the quite striking record. I do want to speak. Let me quickly finish with the facts, and then I want to turn to some of the issues here. I believe it was Judge Grunder asked about the non-compete provisions, and, in fact, after the injury was sustained where the sister's continuing the operation, Mr. Sanks added injury to injury by repeatedly violating his non-compete obligations to H&R Block. He immediately retained the EFIN, the electronic filing credentials that the business had, and used those to open a new competing location, tax and accounting services, through which he fed APA clients and others using that EFIN to file in competition with H&R Block. Counsel, don't we have a legal question under Missouri law as to the reasonableness of applying those non-competition provisions as far as 275 miles from Savannah? The non-compete was only a 50-mile non-compete, and that is a non-compete that has been upheld time and again. The injunction which the court entered enforcing those has not been appealed in the case, so I don't believe that is a live question. But that reasonableness of the non-compete, that issue here, has been sustained by the courts over and over again. With respect to the distance, it is not the fact that Mr. Sanks was operating a business where he was. It's two other points that he violated in the contract by tax and accounting. First of all, he was, as I said, still using the electronic filing credentials of Sanks' income tax, which he was specifically prohibited under the APA to continue to use. Secondly, he was using it to file for the APA clients who he was specifically prohibited to serve under the non-compete provision. Remind me, this case was decided on summary judgment or on district court trial? It was both. It was decided on liability for summary judgment. I'm sorry. Summary judgment was granted on liability, but there was a district court bench trial then as to the damages in the case. The summary judgment aspect of it wouldn't be clear error. There shouldn't be any fact-finding on a summary judgment, right? Well, the Royer case says that the standard on summary judgment we've cited in our briefing is de novo review for summary judgment for legal findings, but that the factual findings by the court on summary judgment are reviewed for clear error. Well, on summary judgment, would the court be making fact findings? In determining what the uncontroverted record is, there are some factual findings in that sense, and I believe that's what the Royer court was referring to. Okay, because if there's a material question of fact, summary judgment shouldn't be entered, right? I agree with you, and there was not in this case. And under any standard, I would submit. Now, is that only because of the sanction, or did the court do an analysis that was independent of the sanction? The court did an independent analysis, and that's clear from the face of the order in the pretrial conference. The judge also confirmed again that he had intended to make it very clear in his summary judgment order that it was not dependent on the sanctions. However, the sanctions that were awarded clearly do also further support the summary judgment determination. And if I may speak to the sanctions. If I had just a quick question on the sanctions, that precluded Sangs from presenting any evidence, too, though, correct? It did not preclude him from presenting any evidence. It was a targeted order that excluded evidence on the subject matters that were embraced by the judge. Right, I should have said any evidence on those particular topics, correct? Certain issues it did, yes. So, is it kind of hard to say that that wasn't dispositive if he was prevented from actually presenting any evidence to counter that particular point? I understand where you're coming from. The sanctions order was not entered until after the summary judgment motion had already been briefed. I believe it may have been between the opposition and reply, but he had already submitted the record, and there was no impact on the briefing by the judge's ruling. When you read the papers on summary judgment, you'll see it refers to if the sanctions are entered, it would have implications, but it was fully briefed and decided on the merits. So there was nothing that prohibited Sangs initially from presenting all of his evidence on each one of the controverted issues. It was just a question of whether the district court was allowed to consider that in determining the outcome of that particular issue. Correct in the first part, he was not prevented from putting forward any evidence on the record. As to the second point, the judge's order would have indicated that he was not going to consider it. The record, however, on his written order shows that he did, in fact, consider all of that. He did an alternative, yes. He did. I understand, thank you. On the sanctions order, very briefly, Mr. Sangs has asserted that that is case dispositive, and so it alone would require affirmation of judgment in Block's favor, unless he's proven that the district court abused the very broad discretion vested to it, which extends to every aspect of the sanctions order, whether to impose the factual findings and what sanctions to impose. There hasn't been any abuse of discretion in this case. To the contrary, Mr. Sangs' briefing doesn't even address or acknowledge the vast majority of the violations that he committed in the court. He says there were only two. This is immediately odd because in the interlocutory appeal he tried to take to this court during the case, he said there were four. If you read the order, it clearly and specifically refers to many more than two, including a lengthy list in the briefing that cited specifically in the court's order that had not even been contested or refuted at all by Mr. Sangs in the district court proceeding. I do want to pause to clarify a misrepresentation in the briefing. To this court, there's a reference. One of the violations that Mr. Sangs does acknowledge is that he had been ordered to go get documents or ask his sister if she would give him documents to produce in the case. She testified in her deposition that he had not. She withstood rehabilitation questioning by Mr. Kramer with Mr. Sangs seated next to him, prompting him. You know, he's asking questions. You remember a conversation sitting at the kitchen table. She stood by her testimony. He had not asked her. In the briefing to this court, there's a suggestion that Ms. Conaway later submitted an errata sheet trying to disavow her testimony, and the brief says that the district court, quote, inexplicably ignored the errata sheet. The district court did not ignore it. The errata sheet was not even created until after the sanctions order was handed down. It was untimely and was a nullity. A deposition is not a take-home exam, as some of the case law we've cited says. But in any event, the district court did not have it. Regardless, either of the two acknowledged violations in the briefing absolutely are substantiated by the record and were, quite frankly, very egregious, and I take absolutely no pleasure in telling the district court about it. There's a suggestion in the briefing that I should be admonished for bringing it to the court's attention. I think that is wholly inappropriate. It was extremely prejudicial to my client, and the conduct in this case was truly egregious, as the district court acknowledged. In any event, separate from those two violations which each substantiate the order, there were a whole host of others that were acknowledged by the court and documented in the record, and the fact that Mr. Sanks doesn't even challenge much of his pattern of abusive conduct in the case makes that sanctions order effectively unassailable. I'm happy to address any questions the court may have about it, but I do want to turn to two points that he's made in his briefing about it. One is he argues that his violative conduct, no matter how egregious, wasn't prejudicial to H&R Block, and that's just not true. His conduct was plainly prejudicial. His obstructive tactics not only delayed our discovery of evidence over and over again and caused the proceedings to be extremely and unduly expensive and protracted, but we have never in the end received all of the discovery, including even documents that he said in his discovery responses he had and would produce. Secondly, he argues that he did not behave willfully. The record amply substantiates the court's finding that he did. However, we've also submitted the Vanderburg case, which was just decided and indicates that willfulness may not even be a requirement in the first instance. As I'm getting my yellow sheet of paper, I'm going to move on to address a couple of other points that were made in counsel's argument. First of all, the notion that the judge had rubber-stamped proceedings here is absolutely not true. The judge's opinions immediately belie that. They went both directions, even on the sanctions order, by way of example. He did not grant all of the relief that we had requested. Judge Kelly had asked about the clients who left with Kathy Conaway, and I want to make clear that the record did reflect, just as you had recalled, that the clients did not—rather, I misspoke. The clients did not leave with Kathy Conaway and stayed at the location. Instead, she herself testified to that. And with respect to—oh, he also made the claim related to that, that Bobby's clients, Bobby Sanks, had gone to block. They didn't stay at 5669. That also is not true. In fact, Jennifer Brown, one of the employees, testified that after he left, she picked up some of his clients at 5669 Okeechee Road. So, again, to your point about your question, was there material injury here? Absolutely there was, and those representations in the MOOC were very much material. On the subject of due diligence, the due diligence forms that were presented to the court only show that block was asking Mr. Sanks, their trusted franchisee, for information and documentation about the sale. The very case law that's cited in Mr. Sanks' brief on the point shows that when you are making specific misrepresentations to an opposing party in a negotiation, you can't rely on the fact that they did other diligence. There was nothing in the diligence to suggest to block that Mr. Sanks was lying. They had every right, legally and logically, to rely on him, and he, in fact, testified in his deposition that it was fair, and he expected them to rely on him. On the settlements, as Mr. Kramer called them, there were no settlements of this matter. The APA provision, again, logically cannot have been releasing his performance of that contract, and in this case, I guess, Belton suspenders, it also, in fact, included the specific language that, quote, nothing herein will operate to release either party of his, her, or its obligation under this asset purchase agreement. There wasn't anything in the franchise licensing about ownership and the obligation that he had to represent that he owned any particular business? Well, the ownership issue is really not what he was ultimately... It's not directly connected to what his liability was in the case. The franchise license agreement, I don't think there's no dispute in the case. He had operated it as a franchise, as he contracted to do. I guess, you know, whether he did or not, we don't know, but it wasn't disputed in the case. He said every client that came into that office was fed through the franchise. Certainly, in the asset purchase agreement, he specifically represented that he had all necessary right, title, and interest in the assets he was supposed to have delivered to H&R Block, and it was uncontroverted that he did not do so, including, as you had noted, the tax files. And, of course, it's nonsensical to say that because Block had information about who the clients were and their tax returns in the system, that it didn't matter to them that he'd left those files with his sister instead of, as Block had directed him to do, believing that it had received transfer of ownership and attempting to exert that ownership, that he had destroyed the files, as he claimed. The testimony by both Mrs. Brown and Mrs. Conaway was that they had themselves kept those files and were still, as of their depositions in this case, using them to serve the clients. I have a question about the First Amendment to the APA. It talks about the forbearance, and then the amended clause talks about if the fees received and collected are less than a certain amount, then the first contingent payment will be reduced dollar for dollar. That's sort of part of the new language. What is your interpretation of this amendment? Is another consequence of his not meeting that goal that you would no longer forbear the claims? It's sort of an unclear wording to me as to what actually this was intended to do. It most certainly was not intended as a release of claims. The APA amendment was intended, as it's reflected on its face, to amend a single term in the APA, which related to a contingent payment. And Mr. Kramer said something to the effect of, you know, it would make no sense. He was giving up $100,000. He wasn't giving up $100,000. He, first of all, had no right under the APA to absolutely receive that $100,000. It was a contingent payment to begin with, conditioned on his, among other things, continued employment at H&R Block, which at that point in time was very much in question. He had offered to H&R Block to give up the right, any right to that $100,000 payment to, and that's the email he likes to refer to, to buy his piece. I think what he took as a release, he was told in response by H&R Block that that was not on the table. They were unwilling to release their claims. However, what they did do, as reflected in the amendment, is they were willing to wait to forbear on their claims while they waited to see whether the revenues would in fact come in, as he was still promising at the time when he was representing to block, that he had no idea what his sister was doing or why she was still operating there. And so as reflected on the face of that amendment, the forbearance term was simply that they would wait and see what happened with the revenues, and if they came in as predicted, perhaps the parties could smooth it over. That, of course, did not happen. I believe I am out of time. Very well. Thank you. How much time does Mr. Kramer have? Mr. Kramer has four minutes and three seconds. Very well. All right. We'll make this quick. Hey, look, if you wanted sanks income tax as part of this transaction, put it in the agreement. It was not in the agreement. Sanks income tax, that entity, didn't perform any tax returns out of the 5669 Ogeechee Road office. All of those tax returns performed out of that office were under the franchise. Block had no problem accepting all of the royalties that it got for all of those tax returns. And when they bought it back, there wasn't anything about sanks income tax. They bought back the very thing that they had franchised. I don't understand your argument. Are you saying the two entities operated out of this same location? Back in the day, in 2008 and before, when his mom was fine, there was sanks income tax. Let me finish. I'm sorry. Are you arguing there were two entities both operating out of this same place and one was sold under the asset purchase agreement and sanks was not sold? Essentially, it was a dormant name. The sanks income tax entity wasn't doing any business. All the business that was being performed was Bobby's franchise. There's no doubt about that. There is no evidence that any tax return other than Bobby's franchise that was operating out of that office and was operating out of the 5710 office, that was part of his franchise. We sold back the exact same thing that we had franchised. So if there was something else that they wanted, they should have put it in the agreement and it wasn't in the agreement. Block didn't want the paper files. There's no record that said that they wanted those paper files. They wanted the electronic records. Sanks did testify that he got an oral offer to purchase his business and he brought that to the attention of Block. He didn't want to sell it to Block. He wanted to sell it to a third party. This location being so important, Bobby was going to move his entire franchise to another location. He was going to move it to the 101 Little Neck Road office. So it didn't matter about that 5669 Ogeechee. With respect to these damages, with respect to the non-compete, that's a small fraction of damages that are involved in this case. The vast majority of it relate to the sale of this franchise. With respect to sanctions, the suggestion that those were appropriate, I think the record doesn't even come close to justifying that. The court identified basically two instances to justify it. One was third party discovery. The court required Bobby Sanks to go well beyond what Rule 34 provides for. We had to go out to nine separate parties, non-parties, individuals, to try to get documents from them. One of which had objected to production of documents based on a subpoena that had been served by Block. Yet we had to go get those. The second item that the court focused on was a false affidavit. And the false affidavit related to when Mr. Sanks set up his email account. It's an easy mistake. He went back, he saw the earliest email, and he thought, hey, look, I must have set it up in 2014. Turns out he was wrong. Turns out it was a few years before that. But what Block hasn't done in any aspect of this case is demonstrate one document, not even one, that they said was prejudicial to them. You've highlighted two things. Is it your position that that's the only two events that the district court relied on to impose sanctions? The district court's order is a little vague on that. It appears in a close reading of that that it does focus on those two. We dispute the comments that were just made that we didn't challenge anything else. We believe that we were fully compliant with all of our discovery obligations throughout this case. So even if you're talking about focusing on two items, but your position is that anything that the district court relied on is just inaccurate, not proper fact-finding in terms of whether you complied with your obligations under discovery? I think I understand your question. And I believe that the district court focused on two aspects. If you look at its order, it identifies two issues that it talks about. It talks about third-party discovery. It talks about, it references back to the October 20 order. And it references the paragraphs that we were supposed to have complied with. One paragraph was paragraph three in the October 20 order, and that included our obligation, well beyond the rules of civil procedure, to go out and get documents from third parties. The other one related to identifying when documents or information became available or inaccessible, which I believe related to the email address. And when we went out and attempted to get documents from Kathy Conaway, Kathy Conaway's son was getting married in a couple of days. She didn't want to be at that deposition. She came back, and she provided an affidavit to the court, an affidavit to the court saying, hey, look, I was wrong. Mr. Sanks did come and get this, did ask me. And there isn't any objection, there isn't any evidence whatsoever that the other eight people that Mr. Sanks had to go out and get information from, that he didn't do it. He did do it. Mrs. Sanks, with her son getting married in a couple of days, didn't recall it. She came back, and she filed an affidavit that was submitted to the court, that was considered by the court, and was rejected by the court. And that demonstrated that we did comply with these onerous obligations. We spent hundreds of hours, counsel spent hundreds of hours, trying to fulfill every little detail that Block imposed on Mr. Sanks. My time's up. If you have any other questions, I'm happy to answer those. Very well. Hearing none, thank you, Counsel. All right. Hey, thank you. The court appreciates the arguments today. The case will be submitted, and an opinion will be issued in due course.